Certiorari Denied, January 4, 2012, No. 33,323

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-017**

**Filing Date: September 19, 2011**

**Docket No. 29,959**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellee,**

**v.**

**SANDRA GREENWOOD,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**John A. Dean, Jr., District Judge**

Gary K. King, Attorney General
Andrew S. Montgomery, Assistant Attorney General
Santa Fe, NM

for Appellee

Jacqueline L. Cooper, Acting Chief Public Defender
B. Douglas Wood III, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**SUTIN, Judge.**

**{1}**     A jury found Defendant Sandra Greenwood guilty of neglect of a resident resulting in death contrary to the Resident Abuse and Neglect Act (the Act), NMSA 1978, §§ 30-47-1 to -10 (1990, as amended through 2010). Defendant's developmentally disabled adult son, Jared, died while under her care and supervision in her home.  We reject Defendant's constitutional vagueness attack and interpret the Act to cover and the evidence to support

Defendant's grossly negligent failure to take any reasonable precaution necessary to prevent Jared's death and therefore affirm Defendant's conviction.

**BACKGROUND**

{2}     Jared and his sister, Journey, were profoundly developmentally disabled adult children of Defendant. This case involves Jared, who was totally dependent on Defendant for his hygiene, grooming, bathing, medications, and cognitive functioning. Jared also required assistance from Defendant with going to the bathroom, getting dressed, and eating.

{3}     At times, more particularly discussed later in this Opinion, Defendant was employed by LINKS II (LINKS), a privately owned personal care agency that employed caregivers who would provide in-home, non-medical care to its clients. LINKS clients are individuals, such as Jared and Journey, who are over the age of twenty-one and who require non-medical assistance, and approximately sixty to seventy percent of LINKS employees are family members of the clients. The caregivers are employed to provide assistance to the clients with such things as cognitive functioning, including cues, reminders and prompts, as well as assistance with light household cleaning, preparing meals, bathing, errands, mobility, and durable medical equipment maintenance. In order to qualify for the LINKS program, prospective clients are required to be examined by a medical doctor who would assess the prospective client's daily living needs and, if necessary, would recommend the need for a caregiver's assistance.

{4}     A care plan for Jared through LINKS was in place from February 2006 to February 2007. This care plan required Defendant as caregiver to devote one hour each day to assist Jared with bowel and bladder functions, thirty minutes each day for cognitive assistance, fifteen minutes each day to help Jared eat, two to three hours each week for household chores, one hour each day for Jared's hygiene, and thirty minutes each day to prepare meals for Jared. A care plan through LINKS was in place for Journey starting in November 2006, with Defendant as the caregiver. The details of Journey's care plan were not in evidence at trial.

{5}     To remain in the LINKS program, clients are required to see a doctor every year; that is, annual renewal of each care contract was conditioned on an annual medical assessment. Defendant failed to obtain that medical assessment for Jared despite LINKS personnel's efforts to help arrange for the medical assessment. That failure caused the care contract for Jared to lapse in February 2007, after which LINKS paid Defendant to provide care for only Journey at the family's residence. Jared died in September 2007 in the family residence.

{6}     On a Saturday evening in September 2007, Defendant contacted her brother and told him that Jared was not "feeling right." Her brother agreed to help Defendant take Jared to the emergency room the next morning if Jared was not better. Sometime the next day, Defendant called her brother to report that Jared was dead. Defendant's brother-in-law arrived at the residence that afternoon and told Defendant that they had to call the police.

2

At Defendant's request, the brother-in-law gave Defendant thirty minutes before notifying the police.

**{7}** Upon arriving at the residence late that afternoon, a detective noticed an overwhelming stench of trash, as if at the dump, along with the smell of feces and the smell of a dead body. He saw Jared's body lying face up on the bathroom floor, and it appeared that someone had attempted to clean the area up around the body, in spite of which attempt Jared's arms, legs, hands, feet, back and face were caked with dried feces, blood, dirt, and trash. Jared's head lay near the toilet, which contained no water but was almost overflowing with feces. Gaping wounds, consisting of pressure ulcers, covered much of Jared's body, including his arms, trunk, chest, abdomen, buttocks, and legs down to his toes. Later examination determined that the pressure ulcers indicated that Jared had been lying on the affected parts of his body for an extended period of time. A forensic pathologist testified regarding the amount of time it takes for pressure ulcers to develop, as well as precautions that should be taken in order to prevent infection of blood by bacteria that enters through such open wounds. Jared suffered from at least eleven areas of ulceration, the majority of which were described as being Stage 4, which is the most deep and severe of ulcer classification.

**{8}** In an adjacent bedroom, a tablecloth and plastic bed sheet had been placed over the carpet which was covered with fecal matter and trash. The kitchen and living room were piled four feet high with garbage, food, dirt, and dead insects. Narrow pathways cut through the heaps of refuse. As the detective photographed the living room area, he discovered Journey sitting amongst the rubble.

**{9}** At the scene, Defendant told a police officer that Jared's death was her fault because she did not take care of him. She voluntarily went to the police station where she gave a videotaped interview. She stated that she did not know Jared was sick, that she did not understand why she did not know, and that there was no excuse or explanation. Distraught and in tears, Defendant also stated,

> He shouldn't be gone, it's my fault, and I can't fix it. . . . He was one hundred percent dependent on me for his life, and I failed him. And it's my fault. I have no explanation and no excuses, and I'm not ever going to offer one. There is no reason for Jared to be gone except for my negligence or my not paying attention. But it wasn't because I didn't care.

**{10}** Defendant was charged with neglect of Jared, a resident in a care facility, resulting in Jared's death, a second degree felony under Section 30-47-5(D) of the Act (the neglect charge). She moved unsuccessfully to dismiss the neglect charge on the grounds that, as a matter of law for the purposes of the Act, her residence was not a "care facility" as it related to Jared, he was not a "resident" of a care facility, and the Act was void because it is unconstitutionally vague. The jury found Defendant guilty of the neglect charge.[1]

---

[1]Defendant was also charged, alternatively, with involuntary manslaughter (negligent act) under NMSA 1978, § 30-2-3(B) (1994). The district court directed a verdict of acquittal

**{11}**     Defendant's points on appeal are that (1) the jury instructions were confusing, making it impossible to know if she was convicted under a proper legal standard; (2) the Act, as a matter of law, was not intended to apply to her house because it does not qualify as a care facility and was not intended to apply to Jared because he did not qualify as a "resident" for purposes of the Act; (3) the Act is void for vagueness on the facts of the case; (4) the State failed to present sufficient evidence for a conviction; and (5) the district court erred in not holding mid-trial voir dire owing to the significant media exposure of the case.

## DISCUSSION

### The Jury Instruction Issue

**{12}**     Under *State v. Benally*, 2001-NMSC-033, 131 N.M. 258, 34 P.3d 1134, on review we determine whether a reasonable juror would have been confused or misdirected by the jury instruction. *Id.* ¶ 12. "Under fundamental error review, . . . the jury verdict will not be reversed unless necessary to prevent a miscarriage of justice." *State v. Sandoval*, 2011-NMSC-022, ¶ 13, 150 N.M. 224, 258 P.3d 1016 (internal quotation marks and citation omitted).

**{13}**     There exists no uniform jury instruction for violation of the Act.  The district court gave the following elements instruction, Instruction No. 4, to the jury.

> For you to find . . . [D]efendant guilty of neglect of a resident resulting in death, as charged in Count 1, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.     Jared . . . was an adult who resided at [Defendant's] residence;
>
> 2.     [Defendant's] residence was a care facility;
>
> 3.     [Defendant], subject to Jared['s] . . . right to refuse treatment and subject to [Defendant's] right to exercise sound medical discretion, was grossly negligent in her failure to take any reasonable precaution that was necessary to prevent damage to Jared['s] . . . health;
>
> 4.     [Defendant's] failure resulted in Jared['s] . . . death;
>
> 5.     This happened in New Mexico on or about the 30th day of September 2007.

as to this charge.

Instruction No. 5 added that the jury had to find that Defendant's gross negligence was a significant cause of Jared's death. The court also gave Instruction No. 8 containing a lesser-included offense of neglect of a resident resulting in no harm.

{14} Defendant appears to have objected to the elements instruction on the neglect charge, and she offered her own elements instruction, which the court refused. The pertinent additional elements Defendant added were that the jury was required to find that "[Defendant] was Jared['s] caretaker"; as his caretaker, "[Defendant] failed to take a reasonable precaution regarding Jared" and failed to take precaution "necessary to prevent damage to the health and safety of Jared"; and Defendant "did not exercise sound medical discretion[.]"

{15} Based on an arguable belief that Jared would not require immediate medical attention in order to stay alive, Defendant sought, and the jury was given, UJI 14-5120 NMRA mistake-of-fact instruction, labeled Instruction No. 6. Defendant did not include a mistake-of-fact element in her proposed elements instruction. Instruction No. 6 required the State to prove that Defendant did not fail to act under an honest and reasonable belief in the existence of the fact that Jared would not require immediate medical attention to stay alive. A written jury note to the court stated: "Could we ask for a clarification on Instruction [No.] 6. Because we are not sure how to interpret Instruction [No.] 6. We deem that Instruction [No.] 6 conflicts with Instruction [No.] 4 and [No.] 5."

{16} The court reviewed the instructions that had been given to the jury and concluded that the elements instruction had been written incorrectly. The court indicated that the use note accompanying UJI 14-5120 instructed that mistake of fact, when given as an instruction, should also be added to the elements of the crime. *See* UJI 14-5120, Use Note 1 ("If this instruction is given, add to the essential elements instruction for the offense charged, 'The defendant did not [act] [fail to act] under a mistake of fact.'"). The court determined that the proper resolution would be to instruct the jury to add the missing component to the previously given elements instruction.

{17} Accordingly, the court responded by writing the following instruction on the same note:

> Please add as [No.] 6
> to Instruction [No.] 4
> the following
> 6) The Defendant did $^{not}$ fail to act under
> a mistake of fact.

The jury did not seek any further clarification regarding Instruction Nos. 4, 5, or 6.

{18} The original Instruction No. 6 submitted to the jury, as it exists in the record in this case, appears to have "not" marked through in the phrase "did not fail to act[.]" No reliable information or explanation regarding this circumstance exists in the record. In a footnote in her brief in chief, Defendant suggests that "[t]he word 'not' . . . was struck from

[Instruction No. 6] but [was] ambiguously included in the court's note to the jurors, 'not' was raised above the rest of the sentence[.]" In its answer brief, the State explains that "the court included the word 'not' in reading the instruction [to the jury]," and "somebody apparently later crossed out the word 'not' in the written copy of Instruction [No.] 6."

**{19}** Nothing material or significant is to be made of the mark-through of "not" in mistake-of-fact Instruction No. 6. Nothing in the record indicates that the mark-through occurred at any time or anywhere other than in the jury room. Defendant in fact acknowledges that it appeared "the jury must have struck the word[.]" The court's handwritten clarification on the jury note was intended to inform the jury that the State was required to prove beyond a reasonable doubt, as an essential element of the offense, that "Defendant did not fail to act under a mistake of fact." After receiving the court's handwritten clarification and deliberating for about forty more minutes, the jury returned its verdict. We see no basis on which to conclude any error existed resulting from the mark-through.

**{20}** Despite the fact that Instruction No. 6 was requested by Defendant, and despite her acknowledgment that the mark-through of "not" in Instruction No. 6 must have been made in the jury room, Defendant contends that this instruction varied from UJI 14-5120 and was "inherently confusing" because "not" was struck from the instruction and because the jury sought a clarification of the instruction. Defendant asserts that the length of time that passed before the jury sought clarification demonstrated the substantial degree of confusion. Defendant explains in a footnote that "[i]t could only otherwise demonstrate that [the jury] failed to follow [the] instruction . . . which directs '[y]ou should be sure that you fully understand the elements of each crime before you deliberate further.'"

**{21}** With respect to the mistake-of-fact instruction, we agree with the State that Defendant failed in her brief in chief to show, in the record, where she objected to the manner in which the jury was instructed by use of the handwritten clarification on the jury's note to the court. Only in her reply brief on appeal does she attempt to describe an objection, but she describes nothing more than defense counsel stating, as to the language chosen by the court that quoted the rule, that "the sentence sounds non-sensical, and that's troubling." Because we find no specific objection, we review this issue only for fundamental error. *Benally*, 2001-NMSC-033, ¶ 12.

**{22}** The issue boils down to whether the jury's apparent confusion before their request for clarification continued after the court's handwritten clarification regarding inserting the additional mistake-of-fact element into Instruction No. 4 and, if so, whether the circumstances give rise to fundamental error. "For fundamental error to exist, the [jury] instruction given must differ materially from the uniform jury instruction, omit essential elements, or be so confusing and incomprehensible that a court cannot be certain that the jury found the essential elements under the facts of the case." *State v. Caldwell*, 2008-NMCA-049, ¶ 24, 143 N.M. 792, 182 P.3d 775 (internal quotation marks and citations omitted).

6

**{23}** No error, much less fundamental error, occurred. The word "not" was in Defendant's own mistake-of-fact Instruction No. 6 as it was read to the jury by the court and, without evidence to the contrary, we must assume that is how Instruction No. 6 went to the jury. As we indicated earlier in this Opinion, there exists no evidence or explanation in the record regarding how or why the word "not" was marked through in Instruction No. 6 as it appears in the record on appeal. Every indication is that the mark-through occurred in the jury room during its deliberations, and we are not persuaded that the mark-through reflects ultimate jury confusion as to the burden on the State in regard to the mistake-of-fact element. And, while the better practice might have been to prepare a typed replacement Instruction No. 4 containing the additional mistake-of-fact element, we cannot say that the manner in which the jury was instructed to consider the additional element as part of Instruction No. 4 meets the fundamental error standard. The clarifying handwritten instruction undisputedly contained the word "not," and the jury was instructed to add the mistake-of-fact element as the sixth element to Instruction No. 4. Defendant complains that "not" in the clarifying instruction was raised above the other wording but fails to show why this added something that tips any balance toward confusion or results in a miscarriage of justice. *See Sandoval*, 2011-NMSC-022, ¶ 13. The jury obviously knew how to alert the court to confusion, and the jury did not raise any issue of confusion after the court's clarification. The jury could in fact have resolved its confusion by reading the court's clarification in tandem with Instruction No. 6.

**{24}** We are equally unpersuaded by Defendant's contentions that Instruction Nos. 4 and 8 did not state the elements clearly and separately and that the instructions' consolidation of the several elements "diminished the significance of some elements and provided an instruction that would have confused any reasonable juror as to how to read and apply the instruction." Noting that there is no uniform jury instruction on the charge, Defendant claims that "shoehorning five elements into a single element . . . created a strong probability of confusion . . . as to how [the jury] could read the several elements and apply them singly." We reject the argument, and we hold that no error occurred in this regard. Defendant acknowledges that all of the elements required to prove the crime are in the instructions. The manner in which the instructions laid out the elements was adequate for jury consideration. Defendant fails to provide any authority even close on the issue to support a determination of error. Nor does Defendant show how any instruction was so confusing and incomprehensible as to forbid certainty that the jury found the essential elements under the facts. An instruction need only fairly and accurately present the law. *Caldwell*, 2008-NMCA-049, ¶ 24. It need only "substantially follow the language of the statute or use equivalent language [to be] sufficient." *State v. Doe*, 100 N.M. 481, 483, 672 P.2d 654, 656 (1983), *modified on other grounds by State v. Beach*, 102 N.M. 642, 699 P.2d 115 (1985). Instructions No. 4 and No. 8 come within these guidelines.

**{25}** Finally, we reject Defendant's argument that the lesser-included offense, Instruction No. 8, was inherently confusing and misleading because it contained an element that "[Defendant's] failure resulted in no harm to Jared[.]" Defendant argues that the confusion necessarily arose because the State would produce no proof of that element and, given that the State was attempting to prove neglect resulting in death, "the jury would believe they were required to find that no harm was suffered, as opposed to no harm resulting directly

7

from neglect." We do not see that Defendant has informed us where in the record she preserved this argument as required in Rule 12-213(A)(4) NMRA. We are not persuaded of inherent confusion or misleading instructions, and we hold that no error, much less fundamental error, occurred in that regard. Instruction No. 8 first required the State to prove that Defendant "was grossly negligent in her failure to take any reasonable precaution that was necessary to prevent damage to Jared['s] . . . health" and then required the State to prove that the "failure resulted in no harm to Jared[.]" The instruction substantially followed the language of Section 30-47-3(E) and (F)(2) and fairly presented the law. The jury was informed in the instruction that the offense was a lesser-included offense. As to guilt, the verdict form gave the jury alternative choices, that is, neglect resulting in death or neglect resulting in no harm as a lesser-included offense. Defense counsel was at liberty to argue the meaning and purpose of the lesser-included offense instruction.

**The Act's Coverage Issues**

{26}    We review issues in regard to the coverage of the Act and statutory interpretation de novo. *See State v. Billington*, 2009-NMCA-014, ¶ 8, 145 N.M. 526, 201 P.3d 857. We endeavor to give effect to the intent of the Legislature, looking first to the statute's plain language and interpreting statutes as a whole to determine legislative intent. *State v. Davis*, 1998-NMCA-148, ¶ 19, 126 N.M. 297, 968 P.2d 808.

{27}    Section 30-47-3(I) of the Act defines "resident" as "any person who resides in a care facility or who receives treatment from a care facility." "Care facility," as it existed in the applicable version of the statute, is defined as

> a hospital; skilled nursing facility; intermediate care facility; care facility for the mentally retarded; psychiatric facility; rehabilitation facility; kidney disease treatment center; home health agency; ambulatory surgical or out-patient facility; home for the aged or disabled; group home; adult foster care home; private residence that provides personal care, sheltered care[,] or nursing care for one or more persons; adult day care center; boarding home; adult residential shelter care home; and any other health or resident care related facility or home but does not include a care facility located at or performing services for any correctional facility[.]

Section 30-47-3(B) (1990).

{28}    Jared resided in Defendant's home. The questions are whether he was residing in a care facility and whether he was receiving treatment from a care facility. Defendant does not dispute that her home, insofar as Journey was concerned, was a care facility. Nor does she dispute that her home was a care facility for Jared during the LINKS care plan that was effective for Jared from February 2006 to February 2007. Defendant's point is that, although Jared resided in her home after February 2007 until his death, the home cannot be considered a "care facility" under the Act in relation to Jared because Defendant was not treating or caring for him under any contract that would bring the home within the meaning of "care facility." In a nutshell, Defendant argues that the Legislature did not intend the Act to be

8

construed to apply to her or Jared because, in her words, "a care facility defined as a private home in which one person is contracted to give care to a second person does not logically encompass the non-contractual care of or by a third person."

{29}    The State contended at trial that Defendant was subject to the Act because Jared was her son, and she recently had been under the LINKS contract for Jared's care that Defendant allowed to lapse by failing to take Jared to a doctor for the requisite annual evaluation. The State also argued that Defendant was the caregiver under the Act for Journey, at the time of Jared's death, in the same home in which Defendant had cared for Jared. The State further relied on *Davis*, 1998-NMCA-148, ¶¶ 18-23, in which the defendant received federal veteran's benefits to be used for the eighty-year-old victim's personal care and was considered the victim's legal custodian for veteran's benefits, and this Court determined that the defendant's mother's home was a care facility under the Act and that the defendant was obligated to care for the victim who was a resident in the home. At trial, Defendant requested a directed verdict and argued that because she was not under any contract to provide care for Jared at the time of his death, she was not subject to the Act. Relying on *Davis*, 1998-NMCA-148, the district court denied Defendant's motion for a directed verdict, explaining that it did not think that "LINKS as a matter of the statute has anything to do with anything" because Defendant was caring for Jared at her home, she was receiving social security income to provide for Jared's care, and Jared was unable to care for himself.

{30}    Defendant maintains that her "statement that Jared . . . was a recipient of social security benefits and that she was not to live off her kids' benefits" was insufficient to "demonstrate the relationship" required for criminal liability under the Act. Further, in Defendant's view, "regardless of the literal language [of the Act] that states that a care facility may be a private home contracted to provide care to one or more persons, it would be absurd to hold that this private home was such a facility beyond the contractual confines of [Defendant's] employment contract." Thus, according to Defendant, because she was not under any contract with LINKS relating to Jared, "as a matter of law, [her] house was not a care facility for purposes of the 'neglect of a resident' statute as it applies to Jared[.]" In addition, Defendant employs the principle of *ejusdem generis* to argue that the several facilities enumerated in the definition of "care facility" in Section 30-47-3(B), different from her private house, "describe institutions whose sole purpose is to provide care"; thus, "the intention of the [L]egislature was to deter and remedy the abuse, neglect[,] and exploitation of those persons receiving care at care facilities, not persons who might also and coincidentally be within the four walls of the same building." Defendant also contends that, in order to avoid an absurd result, the Act must be construed narrowly to evince legislative intent, which she argues is to require a contractual relationship and duty to provide care.

{31}    In that regard, Defendant argues that the Legislature could not have intended "punishment for persons conducting themselves outside the scope of their employment duties." And, related to her legislative-intent pursuit, Defendant points out in a footnote that "[t]he . . . Act is positioned between ticket scalping and tobacco products in the New Mexico Criminal [Manual], further demonstrating that this criminal legislation relates to the [governance] of business regulation and employers and employees and not the conduct and

9

behavior in common homes." Defendant contends that, after February 2007, her private home "was only a care facility for purposes of care being provided to Journey."

{32} To analyze Defendant's arguments, we begin with the provisions of the Act. Its purpose is "to provide meaningful deterrents and remedies for the abuse, neglect[,] or exploitation of care facility residents and to provide an effective system for reporting instances of abuse, neglect[,] or exploitation." Section 30-47-2. Among other proscriptions, the Act criminalizes neglect of a resident that results in the death of the resident. Section 30-47-5(D). "Neglect" is "the grossly negligent . . . failure to take any reasonable precaution that is necessary to prevent damage to the health or safety of a resident[.]" Section 30-47-3(F)(2). A "resident" is "any person who resides in a care facility or who receives treatment from a care facility." Section 30-47-3(I). The definition of "care facility" in effect at the time of Jared's death includes a "private residence that provides personal care[.]" Section 30-47-3(B) (1990).[2]

{33} We see no basis on which to bring Defendant under the Act based on her lone statement about social security or based on the fact that she had a contract with LINKS for Jared's care or that she had a contract with LINKS for Journey's care during the period preceding Jared's death. In regard to social security benefits, there exists no evidence in the record showing any detail whatsoever as to social security benefits, their purpose for Jared, or any restrictions on their use that might apply to Defendant in this case. The State does not point out where in the record it provided any argument, much less evidentiary detail, with regard to social security. Further, while the State mentions public funding and government benefits in its answer brief, the State presents nothing beyond those bare words, no argument, and no persuasive authority as to how receipt by Defendant of government funds to spend for Jared in any way relates causally to Jared's death. The State relies on *Davis*, 1998-NMCA-148, as authority to hold Defendant under the statute. *Davis* does not assist the State because, unlike in *Davis*, here there is no evidence of any particular law or regulation, no evidence of any detail of receipt of funds, no evidence of what funds were to be used for, and no evidence of any fiduciary or other legal obligation on Defendant's part that would show that a failure on her part relating to expenditure of funds was in any way related to Jared's death.

{34} The State offers only *Davis* to support its argument relating to the LINKS contract. In regard to LINKS, even if a current contract were to give rise to a relationship sufficient to bring Defendant under the Act's coverage, we see no basis on which to straddle Defendant with any continuing responsibility based on an expired contract. *See State v. Villa*, 2003-NMCA-142, ¶ 10, 134 N.M. 679, 82 P.3d 46 (holding that there was insufficient evidence to charge the defendant with violation of a permit when the permit was technically not in effect), *aff'd in part, rev'd in part on other grounds by* 2004-NMSC-031, 136 N.M. 367, 98 P.3d 1017.

{35} Importantly, even if the LINKS contract relating to Jared were to have been renewed and to have been in force at the time of Jared's death, we are not convinced that it would be

---

[2]The Act also contains reporting provisions that are not relevant here.

10

the sole basis or even a controlling factor in determining Defendant's legal responsibility under the Act. Defendant's criminal liability must exist solely based on an omission—a failure to act when she had a legal responsibility to act. *See* Deborah A. Goodall, *Penal Code Section 22.04: A Duty to Care for the Elderly*, 35 Baylor L. Rev. 589, 594 (1983) (stating that "authorities have long agreed that before an omission can constitute an offense[,] there must first be a duty to act"); *see also People v. Beardsley*, 113 N.W. 1128, 1129 (Mich. 1907) ("The law recognizes that under some circumstances the omission of a duty owed by one individual to another, where such omission results in the death of the one to whom the duty is owing, will make the other chargeable with manslaughter. This rule of law is always based upon the proposition that the duty neglected must be a legal duty, and not a mere moral obligation. It must be a duty imposed by law or by contract, and the omission to perform the duty must be the immediate and direct cause of death." (citation omitted)). A legal responsibility to act is implicit from the wording in the Act of the criminal behavior—"the grossly negligent . . . failure to take any reasonable precaution that is necessary to prevent damage to the health . . . of a resident[.]" Section 30-47-3(F)(2). The Act is intended to apply to persons in a private residence setting who take on the responsibility as caregivers to care for severely developmentally disabled and other similarly incapacitated adults, including the aged, who are in need of frequent, if not daily, personal assistance and care to stave off harm.

**{36}**     Here, Jared, although an adult child, was essentially a child of young years, unable to care for himself. Children are protected under existing child abuse and neglect criminal laws. *See* NMSA 1978, § 30-6-1 (2009). But those protections end when a child reaches eighteen years of age. *See* § 30-6-1(A)(1). *But see Cohn v. Cohn*, 1997-NMCA-011, ¶¶ 6, 8, 123 N.M. 85, 934 P.2d 279 (holding that "parents have a common law continuing duty to [financially] support a severely disabled child if . . . the child was so disabled before reaching the age of majority"). Defendant undeniably accepted full responsibility for Jared's care. By Defendant's own admission, Jared was "one hundred percent dependent" on her for his life.

**{37}**     We do not read the Act as intended by the Legislature to broadly cover persons who volunteer to essentially just sporadically, or even daily, check in on neighbors or friends or relatives who live alone or perhaps are left alone for hours but who are able to care for themselves. Visitors, neighbors, or other persons who may volunteer to make occasional observations, or parents covered by criminal child abuse statutes, are not the aim of the Act. The aim is to apply to persons who, like Defendant, take on the responsibility of continual, steadfast, and faithful watch and care of someone, like Jared, who cannot care for himself or herself, and who are grossly negligent in carrying out that responsibility by failing, as the Act states, to take any reasonable precaution to prevent damage to health. *See* § 30-47-3(F)(2).

**{38}**     We conclude that, under the Act and the circumstances in this case, the jury could reasonably find that Defendant's home was a "care facility" and Jared was a "resident." Had the Legislature intended to limit its coverage, as Defendant argues, to those caregivers with current contractual obligations or to institutions whose sole purpose is to provide care, the Legislature could have included such limiting language. For criminal liability for neglect,

11

the Act does not expressly require or even refer to any contractual, employment, or financial arrangement between a care facility, care provider, or particular entity, on the one hand, and an individual caregiver who has the hands-on and immediate responsibility of care and of taking reasonable precautions necessary to prevent damage to a resident's health or safety. "[T]he Legislature knows how to include language in a statute if it so desires." *Chatterjee v. King*, 2011-NMCA-012, ¶ 15, 149 N.M. 625, 253 P.3d 915. We hold that the Legislature intended the Act to cover the circumstances in this case.

## The Void-for-Vagueness Issue

**{39}** We review claims of unconstitutional vagueness de novo. *See State v. Laguna*, 1999-NMCA-152, ¶ 24, 128 N.M. 345, 992 P.2d 896. "A strong presumption of constitutionality underlies each legislative enactment, and the party challenging constitutionality has the burden of proving a statute is unconstitutional beyond all reasonable doubt." *Id.* We will review the vagueness challenge to a criminal statute whether or not it was raised in the district court. *Id.* ¶¶ 23-24.

**{40}** The test for unconstitutional vagueness is two-pronged and is set forth in *Laguna*. *Id.* ¶¶ 25-26. The questions to be answered are (1) whether the statute gives fair notice to persons of ordinary intelligence as to the conduct it prohibits, and (2) whether the statute sets standards and guidelines sufficient to avoid arbitrary and discriminatory enforcement. *Id.* Defendant argues that the Act is void for vagueness as applied to the facts of this case on both grounds.

**{41}** Defendant argues that "[n]o person of ordinary intelligence would have understood the [Act] to render [Defendant] responsible for [the] persons living in her home who were not receiving care as specifically overseen or [prescribed] by a care provider." Defendant's point here is that near and at the time of Jared's death, she was "not employed by LINKS as a personal care provider for Jared[,]" and Jared was not receiving services through LINKS.

**{42}** Defendant argues that for her "or any other person of ordinary intelligence to understand how the statute applies to her, she must ascertain various definitions, cross-reference, and match them to each other and distinguish them from the other inapplicable provisions[.]" Defendant particularly complains that by using "whoever commits neglect of a resident" in Section 30-47-5, "the statute does not even require the neglect to occur within or by a person employed by a care facility." Because the Act requires only that the neglected person be a resident of a care facility, Defendant explains, "the person charged with neglect could be a visitor at a care facility and could even commit the neglect in an arena outside of a care facility[.]" Defendant contends that under the Act, as applied to this case, she "would not comprehend that the prohibited behavior applies to her as a mother [unless it also applied] to all persons not employed at institutions." Defendant concludes that if the Act can be read so expansively as to allow prosecution of any person who neglects or abuses any person who qualifies as a resident, even where the abuse or neglect takes place outside the context of a defined care facility, police and prosecutors could potentially enforce the statute in an arbitrary and discriminatory manner. Additionally, Defendant maintains that no person of ordinary intelligence reading the Act would understand that a person in

Defendant's position and circumstance, caring for an individual outside a professional health-care environment, would be on notice of (1) a need to provide the type of medical care that would have prevented Jared from acquiring sepsis, (2) a need to accurately determine a course of action in order to stop ulcer infection, or (3) a need to ascertain the precise point at which she should have sought a physician.

{43}    A defendant will not succeed in a void-for-vagueness challenge "if the statute clearly applied to his [or her] conduct." *Laguna*, 1999-NMCA-152, ¶ 24. We review a defendant's void-for-vagueness challenge "in light of the facts of the case and the conduct which is prohibited by the statute." *Id.* (internal quotation marks and citation omitted). Defendant acknowledged that Jared was one hundred percent dependent on her for his life. Evidence of the extent to which Jared was dependent on a caregiver was presented through the testimony of two doctors, Dr. Koewler and Dr. Poe, among other witnesses. In 2003, Jared was evaluated by Dr. Koewler, a clinical psychologist. Dr. Koewler concluded that Jared had severe mental retardation, possibly had pervasive developmental disorder (autism), and that Jared needed continued supervision because he could not care for himself, and he further testified that these conditions would have been the same in 2007. Dr. Poe, who evaluated Jared in 2006, testified that he determined Jared was incapable of caring for himself to the extent that he was totally dependent on another person for certain tasks, including taking medications, bathing and hygiene, and cognitive functioning.

{44}    There was no evidence that Jared received care from anyone other than Defendant or that Jared resided at any private residence or care facility other than Defendant's home. Coverage under the Act is not limited to individuals receiving care that was specifically overseen or prescribed by a professional care provider. Considering the facts of this case in light of the wording of Section 30-47-3(B), which includes in the definition of "care facility" a "private residence that provides personal care," we conclude that a reasonably intelligent person would understand the Act to apply to a person in Defendant's position and circumstance. Jared's health needs were daily necessities. Defendant's responsibility of care was a constant, steadfast, and faithful one that she acknowledged and undertook. She was the sole provider of Jared's personal care.

{45}    Contrary to Defendant's assertions, the Act does not require a caregiver to accurately determine the precise moment at which a particular medical treatment is necessary. Rather, it requires only that the caregiver take "reasonable precaution" as "necessary to prevent damage to the health or safety of [the] resident[.]" Section 30-47-3(F)(2). Evidence was presented at trial that Jared's death was caused by sepsis which, in turn, was caused by the extensive, severe pressure ulcers that covered Jared's body, a number of which were so deep as to expose bone and had become infected due to the filthy conditions in which Jared was living. The ulcers on Jared's body developed over an "extended period of time" ranging from a few days to weeks or even months. A person of ordinary intelligence could determine that, among the forms of reasonable precaution under the circumstances of this case, simple precautions for the caregiver to take would have been to regularly check Jared's physical condition, to keep Jared's environment and Jared himself free of fecal matter, filth, and other conditions obviously harmful to health, and to seek medical advice or treatment

for apparent conditions that the caregiver was not professionally capable of handling on her own.

**{46}** Defendant also claims that the Act's provisions are confusing to a reader and allow expansive interpretation which could result in arbitrary and discriminatory enforcement. We see no reasonable basis on which to read the language of Section 30-47-4(D) to "encourage or permit police officers, prosecutors, judges, or juries to engage in arbitrary or discriminatory enforcement or to permit standardless or *ad hoc* determinations." *Laguna*, 1999-NMCA-152, ¶ 33. Defendant's complaint that the Act "does not even require the neglect to occur within or by a person employed by a care facility" does not provide a basis on which to conclude vagueness, such that, "an officer, prosecutor, judge, or jury would be unable to distinguish between innocent conduct and conduct threatening harm." *Id.* (internal quotation marks and citation omitted). We believe that a reasonable officer, prosecutor, judge, or jury would be capable of reading the purpose of the Act in tandem with its proscriptions and reasonably determine whether the facts of this or any other case fell within its scope. In conclusion, we hold that the Act is not void for vagueness under either prong of the *Laguna* test. *See Laguna*, 1999-NMCA-152, ¶¶ 25-26.

**The Sufficiency of Evidence Issue**

**{47}** Defendant contends that the State failed to present sufficient evidence for a conviction. First, Defendant contends that the State presented insufficient evidence to prove that her home was a care facility. Next, she contends that the State did not show that she failed to take a precaution. And finally, Defendant claims that she exercised sound medical discretion.

> [W]e apply a substantial evidence standard to review the sufficiency of the evidence at trial. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In performing this review, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict. [We do] not weigh the evidence or substitute [our] judgment for that of the fact finder as long as there is sufficient evidence to support the verdict.

*State v. Chavez*, 2009-NMSC-035, ¶ 11, 146 N.M. 434, 211 P.3d 891 (alteration omitted) (internal quotation marks and citations omitted).

**{48}** Defendant's sufficiency of the evidence arguments pertain to two elements in Instruction No. 4. Those elements are:

2.  [Defendant's] residence was a care facility; [and]

3.  [Defendant], subject to [Jared's] right to refuse treatment and subject to [Defendant's] right to exercise sound medical discretion, was

14

> grossly negligent in her failure to take any reasonable precaution that
> was necessary to prevent damage to [Jared's] health[.]

Defendant contends that the jury did not have sufficient evidence to conclude that her home was a care facility because (1) she was not employed by LINKS to care for Jared at the time of his death, and (2) there was no evidence that she agreed to act as Jared's caregiver and beneficiary as was proved in *Davis*, 1998-NMCA-148.

**{49}** Based on our analyses under the coverage and vagueness sections of this Opinion and viewing the evidence in the light most favorable to the verdict, we determine that a reasonable inference could have been drawn by the jury that Defendant had undertaken the responsibility of being Jared's caregiver in her private residence as contemplated in the Act. *Cf. Davis*, 1998-NMCA-148, ¶¶ 17, 22 (considering the sufficiency of the evidence challenge in light of, among other things, the defendant's statements that he was responsible for the victim's various daily living needs). We therefore reject Defendant's contention that the jury did not have sufficient evidence that Defendant's home was a care facility as defined in the Act.

**{50}** Defendant argues that, under the third element of Instruction No. 4, the State did not show that Defendant failed to take a "precaution that was necessary to prevent damage to Jared['s] health[.]" Defendant argues that none of the State's witnesses indicated an actual precaution that Defendant should have taken that could have saved Jared's life. On the contrary, the State presented testimony from a forensic pathologist, Dr. Nine, who performed Jared's autopsy, regarding the degree of filth on Jared's body, that, according to Dr. Nine, contributed to and likely worsened the infected pressure ulcers and contributed to Jared's death. Dr. Nine also proffered the common-sense axiom that open wounds should not be exposed to feces and dirt so as to lessen the likelihood of infection.

**{51}** Indulging, as we must, "all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict[,]" *Chavez*, 2009-NMSC-035, ¶ 11, we determine that from evidence presented at trial, the jury could infer that Defendant should have taken the reasonable precautions of providing Jared a clean and healthy environment and keeping clean the open sores that covered Jared's body. The jury could reasonably infer from the evidence that the lack of such precautions contributed to Jared's death. Further, evidence was presented from which the jury could infer that had Jared received medical attention when the pressure ulcers began to develop, they could have been treated and managed.

**{52}** Defendant asserts that Section 30-47-3(F) requires the State to prove that Defendant failed to exercise sound medical discretion, and she argues that the State failed to prove this element. Section 30-47-3(F)(2) defines "neglect" to mean "subject to the resident's right to refuse treatment and subject to the caregiver's right to exercise sound medical discretion, the grossly negligent . . . failure to take any reasonable precaution that is necessary to prevent damage to the health . . . of [Jared.]" We do not read this section to place a burden on the State to prove, as an element of the violation of Section 30-47-5(D), that Defendant failed to exercise sound medical discretion. Defendant does not develop any argument or cite any authority to support her contention, and we therefore reject it. The appellate courts "have

long held that to present an issue on appeal for review, an appellant must submit argument *and authority* as required by rule." *State v. Desnoyers*, 2002-NMSC-031, ¶ 11, 132 N.M. 756, 55 P.3d 968 (internal quotation marks and citation omitted), *abrogation on other grounds recognized by State v. Forbes*, 2005-NMSC-027, 138 N.M. 264, 119 P.3d 144; *see* Rule 12-213(A)(4).

**{53}**    As part of or related to the sound medical discretion issue, Defendant argues that she was not trained in the detection of pressure ulcers and the only action she could soundly take, and did take, was giving Jared medicine and planning to take him to the emergency room despite Jared's resistance to changing locales and to unfamiliar medical professionals. Having waited too late to act, she contends, "does not [render] her decisions less than sound because even physicians [cannot] always save people and pressure ulcers can be difficult to treat in any event."

**{54}**    The record reflects that Defendant gave Jared acetaminophen, excedrin, and pepto bismol, determined that he did not have a fever, and contacted her brother to ask for help taking Jared to the hospital if he did not feel better by the next day. According to Defendant, the actions she took were the only actions she could soundly take.

**{55}**    As to all of Defendant's arguments, the evidence at trial indicated that the pressure ulcers that covered Jared's body developed over a number of days, weeks, or months. Of the eleven distinct ulcers Dr. Nine identified on Jared's body, at least six had progressed to stage four, which Dr. Nine indicated is the most severe level of ulceration which reaches deep into the muscle and often involves the bone. Dr. Nine identified stage four ulcers on Jared's left foot and left ankle that exposed bone, as well as ulcers on Jared's right chest region that exposed the bones of his ribs. Based on the fact that Jared's body was covered with ulcers and discoloration, and based on the fact that Defendant admitted to having felt his head, "tummy," and hands for a fever, it was reasonable for the jury to infer that Defendant noticed the condition of Jared's skin. Notwithstanding Defendant's lack of training in the detection of pressure ulcers, the jury could make a reasonable inference that Defendant's decision to administer acetaminophen, pepto bismol, and excedrin to Jared under these circumstances and to postpone the decision about whether to seek medical care was not the exercise of sound medical discretion. Therefore, viewing the evidence in a light most favorable to the verdict and indulging all reasonable inferences in favor of the verdict, *Chavez*, 2009-NMSC-035, ¶ 11, we hold that there was sufficient evidence to support the jury's determination that Defendant was grossly negligent in her failure to take any reasonable precaution that was necessary to prevent damage to Jared's health. *See* § 30-47-3(F)(2).

**Mid-Trial Voir Dire**

**{56}**    Defendant's final claim on appeal is that the district court erred by not conducting mid-trial voir dire of the jury when a local newspaper published a story with "an inflammatory headline containing implications of certain guilt." In Defendant's view, the article caused her to suffer "heightened and distinct" prejudice because it referred to Jared

"rotting in his own waste for an extended period of time" and that Jared was "left to die[.]" The article is not part of the record on appeal.

**{57}** We review Defendant's claim of error regarding mid-trial voir dire for an abuse of discretion. *See, e.g.*, *State v. Holly*, 2009-NMSC-004, ¶¶ 2, 22, 145 N.M. 513, 201 P.3d 844 (explaining that district courts retain "some degree of discretion" in determining whether to conduct mid-trial voir dire under the ABA Standards for Criminal Justice, Fair Trial, and Free Press). In *Holly*, our Supreme Court indicated that to determine whether mid-trial publicity is inherently prejudicial, courts should consider the following factors:

> (1) whether the publicity goes beyond the record or contains information that would be inadmissible at trial, (2) how closely related the material is to matters at issue in the case, (3) the timing of the publication during trial, and (4) whether the material speculates on the guilt or innocence of the accused. In addition, the trial court should consider the likelihood of juror exposure by looking at (1) the prominence of the publicity, including the frequency of coverage, the conspicuousness of the story in the newspaper, and the profile of the media source in the local community; and (2) the nature and likely effectiveness of the trial judge's previous instructions on the matter, including the frequency of instruction to avoid outside materials, and how much time has elapsed between the trial court's last instruction and the publication of the prejudicial material. It is significant whether the trial court merely told the jury to disregard such material or whether the jury was properly instructed to avoid looking at such material altogether.

*Id.* ¶ 20. In *Holly*, the Court determined that an inference of prejudice to the defendant was justified when, in a small community, an article was featured on the front page of the newspaper which discussed details of the defendant's case that "may or may not have come out at trial." *Id.* ¶¶ 25-27. The Supreme Court determined, however, that the error was harmless owing to the fact that "most of the information in the article found its way into the trial record from other sources" and because the overwhelming weight of the incriminating evidence against the defendant at trial rendered unlikely the proposition that the article influenced the jury's verdict. *Id.* ¶¶ 30-31.

**{58}** Here, Defendant claims that the facts in the article go beyond the evidence presented at trial and that the jury's thirteen hours of deliberation indicate that the weight of evidence of Defendant's guilt presented in this case, unlike the evidence in *Holly*, was "far from overwhelming." The State contends that the facts alleged in the newspaper article were presented at trial. Moreover, the State contends that the district court took effective measures to prevent juror exposure to publicity during trial by admonishing the jurors at every recess to avoid listening to, watching, or reading any outside material regarding the trial.

**{59}** Our review of the record indicates that the district court instructed the jury at the beginning of the trial to avoid media coverage of the case. Thereafter, it consistently reminded the jury to avoid media coverage of any kind. And, on the day the article in

question was printed, the district court instructed jurors to altogether avoid the newspaper in which it was printed.

**{60}** The record also reflects that evidence of the statements made in the article, as described to this Court in Defendant's brief in chief, were presented at trial and Defendant refuted one of the statements. Specifically, Defendant contends that the article "alleged that [Defendant] stayed in a motel the night before [Jared's] death and left [him] rotting in his own waste for an extended period of time." At trial, an audio-visual interview was played for the jury during which Defendant stated that "I went to my mom's house Saturday night" and then explained that her brother agreed to help her take Jared to the emergency room if he did not feel better. Additionally, testimony of the investigating officer who photographed the scene of Jared's death reported that there was human feces, some of which was dry and hardened indicating that it had been there for some time, throughout the rooms of the house, including in Jared's bedroom and in the bathroom where his body was discovered. Photographs taken of Defendant's home and of Jared's body which were admitted into evidence also reflect the fact that Jared had lived and died covered in and surrounded by his own waste.

**{61}** Since Defendant has not presented this Court with a record containing the article in question, we indulge "every presumption . . . in favor of the correctness and regularity of the trial court's judgment." *State v. Rojo*, 1999-NMSC-001, ¶ 53, 126 N.M. 438, 971 P.2d 829 (alteration omitted) (internal quotation marks and citation omitted). When there is a doubtful or deficient record, we presume the district court's judgment was correct. *Id.* Given the facts presented at trial compared with Defendant's account of the reported news articles and given the district court's repeated instructions to the jury to avoid media coverage of this case, the facts support the presumption that the district court did not err under the circumstances. We see no abuse of discretion in the court's denial of Defendant's motion to conduct mid-trial voir dire.

## CONCLUSION

**{62}** For the foregoing reasons, we reject Defendant's constitutional vagueness attack and interpret the Act to cover and the evidence to support Defendant's grossly negligent failure to take any reasonable precaution necessary to prevent Jared's death and therefore affirm Defendant's conviction.

**{63}    IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**


**WE CONCUR:**


_____
**CELIA FOY CASTILLO, Chief Judge**

18

_____

**RODERICK T. KENNEDY, Judge**

**Topic Index for** *State v. Greenwood*, **No. 29,959**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-FE | Fundamental Error |
| AE-SB | Substantial or Sufficient Evidence |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-VO | Vague or Overbroad |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-AB | Abuse or Neglect of Adult |
| | |
| **JR** | **JURIES** |
| JR-VD | Voir Dire |
| | |
| **JI** | **JURY INSTRUCTIONS** |
| JI-CJ | Criminal Jury Instructions |
| JI-FG | Failure to Give or Request |
| JI-IJ | Improper Jury Instructions |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |
| ST-RC | Rules of Construction |