PEOPLE v. BEARDSLEY.

1. HOMICIDE—MANSLAUGHTER—INTENT — INFERENCE FROM NEGLI-
     GENCE—DUTY TO ACT.
     Though the law recognizes that under some circumstances the
         omission of a duty owed by one individual to another, where
         such omission results in the death of the one to whom the
         duty is owing, will make the other chargeable with man-
         slaughter, the rule is based upon the proposition that the duty
         neglected must be a legal duty, imposed by law or by con-
         tract, and not a mere moral obligation, and the omission to
         perform the duty must be the immediate and direct cause of
         death.

2. SAME—DEATH FROM NEGLIGENCE—LEGAL DUTY TO ACT.
     Where a married man, during his wife's temporary absence
         from home, engaged in a drunken debauch with deceased, a
         woman, who had full knowledge of the circumstances and
         had had ample experience in such affairs, he owed her no
         legal duty of care and protection such as to render him legally
         responsible for her death from an overdose of morphine, taken
         with suicidal intent during the debauch, though he neglected
         to obtain medical assistance for her.

Error to Oakland; Smith, J. Submitted April 18,
1907. (Docket No. 62.) Decided December 10, 1907.

Carroll Beardsley was convicted of manslaughter, and
sentenced to imprisonment for not less than one nor more
than five years in the State prison at Jackson. Reversed,
and respondent discharged.

*Aaron Perry* and *M. F. Lillis*, for appellant.

*Frank L. Covert*, Prosecuting Attorney, and *Charles
S. Matthews*, Assistant Prosecuting Attorney, for the
people.

McALVAY, C. J. Respondent was convicted of man-
slaughter before the circuit court for Oakland county, and

was sentenced to the State prison at Jackson for a minimum term of one year and a maximum term not to exceed five years. He was a married man living at Pontiac, and at the time the facts herein narrated occurred, he was working as a bartender and clerk at the Columbia Hotel. He lived with his wife in Pontiac, occupying two rooms on the ground floor of a house. Other rooms were rented to tenants, as was also one living room in the basement. His wife being temporarily absent from the city, respondent arranged with a woman named Blanche Burns, who at the time was working at another hotel, to go to his apartments with him. He had been acquainted with her for some time. They knew each others habits and character. They had drunk liquor together, and had on two occasions been in Detroit and spent the night together in houses of assignation. On the evening of Saturday, March 18, 1905, he met her at the place where she worked, and they went together to his place of residence. They at once began to drink and continued to drink steadily, and remained together, day and night, from that time until the afternoon of the Monday following, except when respondent went to his work on Sunday afternoon. There was liquor at these rooms, and when it was all used they were served with bottles of whiskey and beer by a young man who worked at the Columbia Hotel, and who also attended respondent's fires at the house. He was the only person who saw them in the house during the time they were there together. Respondent gave orders for liquor by telephone. On Monday afternoon, about one o'clock, the young man went to the house to see if anything was wanted. At this time he heard respondent say they must fix up the rooms, and the woman must not be found there by his wife, who was likely to return at any time. During this visit to the house the woman sent the young man to a drug store to purchase, with money she gave him, camphor and morphine tablets. He procured both articles. There were six grains of morphine in quarter-grain tablets. She con-

cealed the morphine from respondent's notice, and was discovered putting something into her mouth by him and the young man as they were returning from the other room after taking a drink of beer. She in fact was taking morphine. Respondent struck the box from her hand. Some of the tablets fell on the floor, and of these, respondent crushed several with his foot. She picked up and swallowed two of them, and the young man put two of them in the spittoon. Altogether it is probable she took from three to four grains of morphine. The young man went away soon after this. Respondent called him by telephone about an hour later, and after he came to the house requested him to take the woman into the room in the basement which was occupied by a Mr. Skoba. She was in a stupor and did not rouse when spoken to. Respondent was too intoxicated to be of any assistance and the young man proceeded to take her downstairs. While doing this Skoba arrived, and together they put her in his room on the bed. Respondent requested Skoba. to look after her, and let her out the back way when she waked up. Between nine and ten o'clock in the evening Skoba became alarmed at her condition. He at once called the city marshal and a doctor. An examination by them disclosed that she was dead.

Many errors are assigned by respondent, who asks to have his conviction set aside. The principal assignments of error are based upon the charge of the court, and refusal to give certain requests to charge, and are upon the theory that under the undisputed evidence in the case, as claimed by the people and detailed by the people's witnesses, the respondent should have been acquitted and discharged. In the brief of the prosecutor his position is stated as follows:

"It is the theory of the prosecution that the facts and circumstances attending the death of Blanche Burns in the house of respondent were such as to lay upon him a duty to care for her, and the duty to take steps for her protection, the failure to take which, was sufficient to

constitute such an omission as would render him legally responsible for her death. * * * There is no claim on the part of the people that the respondent * * * was in any way an active agent in bringing about the death of Blanche Burns, but simply that he owed her a duty which he failed to perform, and that in consequence of such failure on his part she came to her death."

Upon this theory a conviction was asked and secured.

The law recognizes that under some circumstances the omission of a duty owed by one individual to another, where such omission results in the death of the one to whom the duty is owing, will make the other chargeable with manslaughter. 21 Cyc. p. 770 et seq., and cases cited. This rule of law is always based upon the proposition that the duty neglected must be a legal duty, and not a mere moral obligation. It must be a duty imposed by law or by contract, and the omission to perform the duty must be the immediate and direct cause of death. 1 Bishop on Criminal Law (6th Ed.), § 217; 2 Bishop on Criminal Law (6th Ed.), § 695; 21 Am. & Eng. Enc. Law (2d Ed.), p. 99; 21 Cyc. p. 770 et seq.; *State* v. *Noakes*, 70 Vt. 247; 2 Wharton on Criminal Law (7th Ed.), § 1011; Clark & Marshall on Crimes (2d Ed.), p. 379 (*e*), and cases cited.

Although the literature upon the subject is quite meagre and the cases few, nevertheless, the authorities are in harmony as to the relationship which must exist between the parties to create the duty, the omission of which establishes legal responsibility. One authority has briefly and correctly stated the rule, which the prosecution claims should be applied to the case at bar, as follows:

" If a person who sustains to another the legal relation of protector, as husband to wife, parent to child, master to seaman, etc., knowing such person to be in peril of life, willfully or negligently fails to make such reasonable and proper efforts to rescue him as he might have done without jeopardizing his own life or the lives of others, he is guilty of manslaughter at least, if by reason of his omission of duty the dependent person dies.

150 MICH.—14.

"So one who from domestic relationship, public duty, voluntary choice, or otherwise, has the custody and care of a human being, helpless either from imprisonment, infancy, sickness, age, imbecility, or other incapacity of mind or body, is bound to execute the charge with proper diligence and will be held guilty of manslaughter, if by culpable negligence he lets the helpless creature die." 21 Am. & Eng. Enc. Law (2d Ed.), p. 197, notes and cases cited.

The following brief digest of cases gives the result of our examination of American and English authorities, where the doctrine of criminal liability was involved when death resulted from an omission to perform a claimed duty. We discuss no cases where statutory provisions are involved.

In *Territory* v. *Manton*, 8 Mont. 95, a husband was convicted of manslaughter for leaving his intoxicated wife one winter's night lying in the snow, from which exposure she died. The conviction was sustained on the ground that a legal duty rested upon him to care for and protect his wife, and that his neglect to perform that duty, resulting in her death, he was properly convicted.

*State* v. *Smith*, 65 Me. 257, is a similar case. A husband neglected to provide clothing and shelter for his insane wife. He left her in a bare room without fire during severe winter weather. Her death resulted. The charge in the indictment is predicated upon a known legal duty of the husband to furnish his wife with suitable protection.

In *State* v. *Behm*, 72 Iowa, 533, the conviction of a mother of manslaughter for exposing her infant child without protection, was affirmed upon the same ground. See, also, *Gibson* v. *Commonwealth*, 106 Ky. 360.

*State* v. *Noakes*, supra, was a prosecution and conviction of a husband and wife for manslaughter. A child of a maid servant was born under their roof. They were charged with neglecting to furnish it with proper care. In addition to announcing the principle in support of which the case is already cited, the court said:

"To create a criminal liability for neglect by nonfeasance, the neglect must also be of a personal, legal duty, the natural and ordinary consequences of neglecting which would be dangerous to life."

In reversing the case for error in the charge—not necessary to here set forth—the court expressly stated that it did not concede that respondents were under a legal duty to care for this child because it was permitted to be born under their roof, and declined to pass upon that question.

In a Federal case tried in California before Mr. Justice Field of the United States Supreme Court, where the master of a vessel was charged with murder in omitting any effort to rescue a sailor who had fallen overboard, the learned Justice in charging the jury said:

"There may be in the omission to do a particular act under some circumstances, as well as in the commission of an act, such a degree of criminality as to render the offender liable to indictment for manslaughter.  *  *  * In the first place the duty omitted must be a plain duty *  *  * In the second place it must be one which the party is bound to perform by law or contract, and not one the performance of which depends simply upon his humanity, or his sense of justice or propriety." *United States* v. *Knowles*, 4 Sawyer (U. S.), 517.

The following English cases are referred to as in accord with the American cases above cited, and are cases where a clear and known legal duty existed: *Reg.* v. *Conde*, 10 Cox Crim. Cas. 547; *Reg.* v. *Rugg*, 12 Cox Crim. Cas. 16.

The case of *Reg.* v. *Nicholls*, 13 Cox Crim. Cas. 75, was a prosecution of a penniless old woman, a grandmother, for neglecting to supply an infant grandchild left in her charge with sufficient food and proper care. The case was tried at assizes in Stafford before Brett, J., who said to the jury:

"If a grown up person chooses to undertake the charge of a human creature, helpless either from infancy, simplicity, lunacy, or other infirmity, he is bound to execute that charge without (at all events) wicked negligence, and

if a person who has chosen to take charge of a helpless creature lets it die by wicked negligence, that person is guilty of manslaughter."

The vital question was whether there had been any such negligence in the case designated by the trial judge as wicked negligence. The trial resulted in an acquittal. The charge of this nisi prius judge recognizes the principle that a person may voluntarily assume the care of a helpless human being, and having assumed it, will be held to be under an implied legal duty to care for and protect such person. The duty assumed being that of care taker and protector to the exclusion of all others.

Another English case decided in the appellate court, Lord Coleridge, C. J., delivering the opinion, is *Reg.* v. *Instan*, 17 Cox Crim. Cas. 602. An unmarried woman without means lived with and was maintained by her aged aunt. The aunt suddenly became very sick, and for ten days before her death was unable to attend to herself, to move about, or to do anything to procure assistance. Before her death no one but the prisoner had any knowledge of her condition. The prisoner continued to live in the house at the cost of the deceased and took in the food supplied by the tradespeople. The prisoner did not give food to the deceased, or give or procure any medical or nursing attendance for her; nor did she give notice to any neighbor of her condition or wants, although she had abundant opportunity and occasion to do so. In the opinion, Lord Coleridge, speaking for the court, said:

"It is not correct to say that every moral obligation is a legal duty; but every legal duty is founded upon a moral obligation. In this case, as in most cases, the legal duty can be nothing else than taking upon one's self the performance of the moral obligation. There is no question whatever that it was this woman's clear duty to impart to the deceased so much of that food, which was taken into the house for both and paid for by the deceased, as was necessary to sustain her life. The deceased could not get it for herself. She could only get it through the prisoner. It was the prisoner's clear duty at common law

to supply it to the deceased, and that duty she did not perform. Nor is there any question that the prisoner's failure to discharge her legal duty, if it did not directly cause, at any rate accelerated, the death of the deceased. There is no case directly on the point; but it would be a slur and a stigma upon our law if there could be any doubt as to the law to be derived from the principle of decided cases, if cases were necessary. There was a clear moral obligation, and a legal duty founded upon it; a duty willfully disregarded and the death was at least accelerated, if not caused, by the nonperformance of the legal duty."

The opening sentences of this opinion are so closely connected with the portion material to this discussion that they could not well be omitted. Quotation does not necessarily mean approval. We do not understand from this opinion that the court held that there was a legal duty founded solely upon a moral obligation. The court indicated that the law applied in the case was derived from the principles of decided cases. It was held that the prisoner had omitted to perform that which was a clear duty at the common law. The prisoner had wrongfully appropriated the food of the deceased and withheld it from her. She was the only other person in the house, and had assumed charge of her helpless relative. She was under a clear legal duty to give her the food she withheld, and under an implied legal duty by reason of her assumption of charge and care, within the law as stated in the case of *Reg.* v. *Nicholls,* supra. These adjudicated cases and all others examined in this investigation we find are in entire harmony with the proposition first stated in this opinion.

Seeking for a proper determination of the case at bar by the application of the legal principles involved, we must eliminate from the case all consideration of mere moral obligation, and discover whether respondent was under a legal duty towards Blanche Burns at the time of her death, knowing her to be in peril of her life, which required him to make all reasonable and proper effort to

save her; the omission to perform which duty would make him responsible for her death. This is the important and determining question in this case. If we hold that such legal duty rested upon respondent it must arise by implication from the facts and circumstances already recited. The record in this case discloses that the deceased was a woman past 30 years of age. She had been twice married. She was accustomed to visiting saloons and to the use of intoxicants. She previously had made assignations with this man in Detroit at least twice. There is no evidence or claim from this record that any duress, fraud, or deceit had been practiced upon her. On the contrary it appears that she went upon this carouse with respondent voluntarily and so continued to remain with him. Her entire conduct indicates that she had ample experience in such affairs.

It is urged by the prosecutor that the respondent "stood towards this woman for the time being in the place of her natural guardian and protector, and as such owed her a clear legal duty which he completely failed to perform." The cases cited and digested establish that no such legal duty is created based upon a mere moral obligation. The fact that this woman was in his house created no such legal duty as exists in law and is due from a husband towards his wife, as seems to be intimated by the prosecutor's brief. Such an inference would be very repugnant to our moral sense. Respondent had assumed either in fact or by implication no care or control over his companion. Had this been a case where two men under like circumstances had voluntarily gone on a debauch together and one had attempted suicide, no one would claim that this doctrine of legal duty could be invoked to hold the other criminally responsible for omitting to make effort to rescue his companion. How can the fact that in this case one of the parties was a woman, change the principle of law applicable to it? Deriving and applying the law in this case from the principle of decided cases, we do not find that such legal duty as is contended for existed in

·fact or by implication on the part of respondent towards the deceased, the omission of which involved criminal liability.    We find no more apt words to apply to this case than those used by Mr. Justice Field in *United States* v. *Knowles,* supra.

" In the absence of such obligations, it is undoubtedly the moral duty of every person to extend to others assistance when in danger;   *   *   *   and if such efforts should be omitted by any one when they could be ,made without imperiling his own life, he would, ·by his conduct, draw upon himself the just censure and reproach of good men; but this is the only punishment to which he would be subjected by society."

Other questions discussed in the briefs need not be considered.    The conviction is set aside, and respondent is ordered discharged.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.