RENDERED: JUNE 9, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0217-MR

BRAD A. ROBERTS                                          APPELLANT

v.                    
APPEAL FROM BOYD CIRCUIT COURT
HONORABLE GEORGE DAVIS, JUDGE
ACTION NO. 18-CR-00727-003

COMMONWEALTH OF KENTUCKY                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: COMBS, McNEILL, AND TAYLOR, JUDGES.

COMBS, JUDGE: This is an appeal from a criminal conviction. Appellant, Brad Roberts (Roberts), was a shift supervisor at the Boyd County Detention Center (BCDC) when the death of an inmate occurred. With respect to that death, Roberts was convicted of one count of reckless homicide, six counts of first-degree criminal abuse, four counts of second-degree criminal abuse, and one count of third-degree criminal abuse. On appeal, Roberts contends that there was

insufficient evidence to convict him of reckless homicide. After our review, we affirm.

On December 21, 2018, a Boyd County grand jury indicted Roberts for one count of first-degree manslaughter in the death of the inmate, Michael Moore. Four other deputies were also charged: Zack Messer, Colton Griffith, Jeremy Mattox, and Alicia Beller. The grand jury subsequently indicted Roberts for **16** counts of first-degree criminal abuse.

The case was tried in October 2021. The evidence established that Moore was arrested on the evening of November 27, 2018, and was charged with public intoxication. The arresting officer, John McCormick, described Moore as apparently intoxicated, at times lively, but mostly passively resistant. The assisting arresting officer, Demarius Gully, testified that Moore was not resisting when they walked him back to the cruiser -- although they had to keep asking him to put his feet down and walk. Neither officer observed any injuries on Moore before transporting him to BCDC other than that he had some blood coming from his foot.[1]

Roberts was shift supervisor on the evening of November 27, 2018, and he was the highest ranking officer present when Moore was booked into the BCDC. The ultimately fatal injury occurred in the early morning hours of

---

[1] According to Roberts, Moore had a small cut on the top of his toe.

November 28, 2018, when Deputies Messer and Griffith escorted Moore to the bathroom and threw him into a metal toilet/sink. In the early morning of November 29, 2018, Moore suffered two seizures. Later that morning, Moore was found unresponsive. Paramedics were called, but they were unable to resuscitate Moore.

Testimony of the paramedics, James Boyd and Matt Daniels, established that when they arrived shortly after 7:00 a.m., jail staff was attempting CPR. Moore was lying on the floor. He did not have a pulse. He had no rebound during chest compressions, which is indicative of significant trauma. Multiple bruising was noted on Moore's wrists, ankles, face, and head. Daniels stopped resuscitation when he saw asystole (flatline) -- or complete failure of the heart's electrical system on the heart monitor. Moore was pronounced dead.

On November 30, 2018, Dr. Lauren Lippencott performed an autopsy to aid in determining the cause of death. She noted multiple injuries -- abrasions, contusions, and lacerations -- on Moore's head, torso, and extremities. Dr. Lippincott identified autopsy photographs of Moore's injuries. The autopsy revealed three rib fractures and a hemothorax, or collection of blood, in Moore's left pleural cavity caused by internal bleeding from the rib fractures. Dr. Lippencott testified that there was the equivalent of two liters of blood in Moore's chest cavity and that the human body usually contains about five to six liters of

blood. According to Dr. Lippincott, the bleeding was an acute injury. The blood prevented Moore's lung from expanding appropriately, causing difficulty in breathing. Dr. Lippincott opined that Moore's death was due to the injuries to his torso, which caused posterior rib fractures and the resultant bleeding. Dr. Lippincott demonstrated the location of Moore's rib fractures: on his back, on the left side.

The coroner determined the cause of Moore's death to be blunt force injuries to the torso as reflected on the death certificate.

Gus Guzman, Chief Deputy at BCDC, testified. In November 2018, he was a Lieutenant at the facility. His duties included record-keeping. He secured the footage from the BCDC video system from the time that Moore entered the jail on November 27, 2018, until his death on November 29, 2018. Clips of that video footage were played for the jury. Guzman testified that the jailer and deputies are responsible for the care of inmates while they are in the facility; he read into the record the statutory authority supporting that responsibility.

Kentucky State Police Detective Jeffrey Kelley investigated the incident. He arrived at BCDS on November 29, 2018. Detective Kelley interviewed Roberts because he was the sergeant on duty on the nights of November 27 and 28, 2018, and was the top official in the chain of command at

that time. Detective Kelley obtained all 36 hours of video footage pertaining to Moore's stay at BCDC. After reviewing the video, conducting interviews, and watching the autopsy, Detective Kelley returned to take more pictures. He identified photographs of the bathroom, including the combination metal toilet/sink.

Detective Kelley conducted a second interview of Roberts on December 10, 2018, portions of which were played at trial. Detective Kelley testified that he talked to Roberts about an incident that occurred in the bathroom on November 28, 2018. Roberts told Detective Kelley that Moore had tried to come out of the bathroom. And so Deputy Messer and Deputy Griffith were throwing him into the metal toilet unit and into the wall in order to force him to go to the bathroom. Roberts said that he did not see the encounter -- but that he heard it and that it sounded like someone's head bouncing off the wall.

Detective Kelley testified that the video footage -- which was played during his testimony -- showed that Roberts went into the bathroom during that incident. Following the bathroom incident, Moore was placed back in a restraint chair. Roberts then spoke to staff in the control room -- admonishing Messer about his use of force -- that he was being "too rough."

In his second interview, Detective Kelley also followed up with Roberts about Moore's seizures, which occurred in the early morning of November

29, 2018.  At that time, Moore was in cell C.  He had a seizure around 4:00-4:30 a.m.  Moore was lucid when Roberts checked on him; so Roberts went back to his office.  Around 5:30 a.m., Roberts was notified that Moore was having another seizure.  Roberts said that he entered the cell.  Moore's head dropped back.  Roberts administered an ammonia inhalant and a sternum rub.  Moore told Roberts that he was too weak to go downstairs.  Roberts said that he got a mat. They put Moore on the mat and carried him downstairs.[2]  Moore was placed back in the restraint chair.  Roberts said that this occurred around 6:10 a.m.; that he walked up front and told the day shift supervisor that they had "one in the chair" (not for disciplinary) and that he needed to see medical.  However, Roberts did **not** contact medical after the seizures, nor did he call for emergency services.

Detective Kelley also testified about a book kept in the booking area specifying how to deal with medical incidents for one who was not medically trained.  According to Detective Kelley, Roberts said he had found out about this book when he started on night shift three months earlier.[3]  The section on seizures provides:  "Notify practitioner for transfer to E.R. if seizures longer than five minutes or multiple seizures."  Detective Kelley testified that Roberts told him that

---

[2] Video footage played during Detective Kelley's testimony shows Moore's legs giving way as he was escorted into the hallway outside the cell C door.  After several seconds, Moore was taken up from the floor, carried to a stairwell at the end of the hallway, and transported downstairs on a mat.

[3] At trial, Roberts testified that he did not know where the book was kept.

-6-

Moore had had **two** seizures. The section further provides that "if detainee is on drug protocol and has a seizure, call practitioner." Detective Kelley testified that Moore was intoxicated when he was brought in and was "high" throughout his stay at the jail. Nevertheless, to Detective Kelley's knowledge, Roberts did not call the practitioner, and there was no written note given to the nurse or to anyone about the seizure. Prior to Roberts's leaving BCDC, no report was filed that Moore had had a seizure.

Deputy Alicia Beller testified. She was working the evening shift -- 6:00 p.m. to 6:00 a.m. -- on November 27, 2018. Deputy Beller could observe the deputies' interactions with Moore from the control room where she was assigned to work that evening. She saw the other deputies being rough with Moore. Deputy Beller spoke with Roberts about it and about "maybe getting Mr. Moore some medical treatment." Asked why she thought Moore might need medical treatment, she responded, "because he got his head beat off the wall." Roberts's response was that Moore did not need medical treatment. Deputy Beller was present and recalled Roberts's conversation with the deputies in the control room. She testified that Roberts was talking to the deputies about being too rough. The deputies were laughing. Deputy Beller also testified that she asked, "what the cracking sound was" that she had heard.

Kristin Gillum is a licensed practical nurse who worked at BCDC. Her hours were from 8:00 a.m. to 4:30 p.m. She first saw Moore when she came into work on November 28, 2018. The booking officer mentioned that Moore had been pointing to his back and said that his back was hurting. Gillum testified that Moore "was complaining of pain below the rib cage." She did not see any bruising or redness. Gillum was unable to do a full assessment of Moore because he was not answering questions. Moore did have a "pump knot" on his head. Gillum testified that if she had been told that he had been injured the night before, they probably would have gotten him further evaluation and would have sent him to the E.R.

Roberts testified at trial. He has a high school diploma, received two years of welding school training, and had considerable experience as a volunteer fireman. He received basic first aid training, CPR, and AED (defibrillator) training at the fire department.[4] Roberts initially started working for BCDC in 2016 as a floor deputy. He received the basic 40 hours of training when he was hired. After that, there was an annual computer class. He also received training and was certified in the use of the taser.

---

[4] Tim England, Deputy Chief of Westwood Volunteer Fire Department, testified that Kentucky has a 150-hour certification requirement for volunteer firefighters as well as 20 hours per year of continuing classes to maintain that certification. Sgt. Roberts has been one of their firefighters for at least 11 years and had received the 150-hour certification before November 2018.

Roberts eventually became shift supervisor in August or September 2018. He testified that he did not receive additional training when he became shift supervisor. According to Roberts, the supervisors did the same thing as the floor deputies. He testified that he did not know the duties involved or what was expected of him; that he was not taught how to supervise or manage people or how to run a shift.

On cross-examination, Roberts agreed that as a volunteer firefighter, he had responded to emergency calls. Roberts agreed that he was the highest ranking officer in the BCDC from 6:00 p.m. to 6:00 a.m. on November 27-28, and he acknowledged that as supervisor, he had a duty to protect the inmates and to supervise his employees. Roberts testified that he never told Deputy Messer to stay away, that he never sent him to another part of the jail, and that he never sent him home.

On October 13, 2021, the jury found Roberts guilty of one count of reckless homicide, six counts of first-degree criminal abuse, four counts of second-degree criminal abuse, and one count of third-degree criminal abuse. The jury sentenced him to 15-years' imprisonment.

On appeal, Roberts argues that there was insufficient evidence to convict him of reckless homicide. The issue is preserved for our review.

In *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991), our

Supreme Court explained as follows:

> On motion for directed verdict, the trial court must draw
> all fair and reasonable inferences from the evidence in
> favor of the Commonwealth. If the evidence is sufficient
> to induce a reasonable juror to believe beyond a
> reasonable doubt that the defendant is guilty, a directed
> verdict should not be given. For the purpose of ruling on
> the motion, the trial court must assume that the evidence
> for the Commonwealth is true, but reserving to the jury
> questions as to the credibility and weight to be given to
> such testimony.

 "This standard applies whether the evidence is direct or circumstantial." *Brewer*

*v. Commonwealth,* 206 S.W.3d 313, 318-19 (Ky. 2006). *Benham* further defines

our role as an appellate court in analyzing the propriety of a directed verdict:

> On appellate review, the test of a directed verdict
> is, if under the evidence as a whole, it would be clearly
> unreasonable for a jury to find guilt, only then the
> defendant is entitled to a directed verdict of acquittal . . . .
>
> [T]here must be evidence of substance, and the trial court
> is expressly authorized to direct a verdict for the
> defendant if the prosecution produces no more than a
> mere scintilla of evidence.

*Benham*, 816 S.W.2d at 187-88.

KRS[5] 507.050(1) provides that "[a] person is guilty of reckless

homicide when, with recklessness he causes the death of another person."

---

[5] Kentucky Revised Statutes.

KRS 501.020(4) defines the mental state "recklessly" as follows:

> A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

*Commonwealth v. Hasch*, 421 S.W.3d 349, 355-56 (Ky. 2013), provides additional analysis as follows:

> The so-called "straight" reckless homicide theory [is]where the defendant acts without the specific intent to kill and in doing so, fails to perceive a substantial and unjustifiable risk that his actions could cause the victim's death, *see* KRS 507.050(1) and KRS 501.020(4) . . . .
>
> . . .
>
> Under the straight theory of reckless homicide, KRS 507.050(1), a reckless failure to perceive the risk that the defendant's actions would result in the victim's death supplies the element of recklessness necessary to sustain a reckless homicide conviction.

Roberts contends that the jury was required to find: (1) that he caused Moore's death and (2) that he failed to perceive a substantial and unjustifiable risk that his conduct would result in Moore's death. He disagrees that the risk was of such nature and degree that his conduct in failing to perceive it constituted a gross deviation from the standard of care that a reasonable person would have observed

-11-

in the same situation.  Roberts submits that "[t]here were proof problems with both of these elements."

First, Roberts argues that the Commonwealth "never even attempted to prove that [he] caused Moore's death."  The Commonwealth asserts that it was Roberts's ***inaction*** -- his failure to stop the abuse and his failure to get medical treatment for Moore -- which caused Moore's death.  Furthermore, the Commonwealth notes that to be found guilty of reckless homicide based upon a failure to act, the defendant must have owed the victim a legal duty, citing *West v. Commonwealth*, 935 S.W.2d 315 (Ky. App. 1996).  In *West*, the Court explained as follows:

> The law recognizes that under some circumstances the omission of a duty owed by one individual to another, where such omission results in the death of the one to whom the duty is owing, will make the other chargeable with manslaughter. This rule of law is always based upon the proposition that the duty neglected must be a legal duty, and not a mere moral obligation. It must be a duty imposed by law or contract, and the omission to perform the duty must be the immediate and direct cause of death[.]

*Id.* at 317 (quoting *People v. Beardsley*, 113 N.W. 1128, 1129 (1907)).  Moreover, "in the case of reckless homicide or manslaughter, the duty must be found outside the definition of the crime itself.  The duty of care imposed may be found in the common law or in another statute." *Id.*

-12-

The duties of jailers are set forth by several statutes. KRS 71.020(1) provides in relevant part that: "Each jailer shall have the custody, rule and charge of the jail in his county and of all persons in the jail and shall keep the same himself or by his deputy or deputies." KRS 71.040 mandates that "[t]he jailer shall treat [prisoners] humanely and furnish them with proper food and lodging during their confinement." KRS 71.060(1) provides that "[t]he jailer shall be liable on his official bond for the conduct of his deputies. The deputies shall have all the powers and be subject to the same penalties as the jailer." As the Commonwealth observes, "the law imposes the duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody[.]" *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 479 (Ky. 2006).

Roberts clearly owed a legal duty to Moore to prevent unlawful injury to him and to treat him humanely. We agree with the Commonwealth that Roberts breached that duty when he failed to stop his deputies from physically abusing Moore and participated in the abuse himself -- and then by failing to seek medical treatment for Moore. As the Commonwealth notes, "[i]t has long been the law that the Commonwealth can prove all the elements of a crime by circumstantial evidence." *Commonwealth v. Goss*, 428 S.W.3d 619, 625 (Ky. 2014).

In the case before us, the Commonwealth presented evidence which established that Moore had no significant injuries when he arrived at BCDC.

-13-

Video footage revealed that Roberts's deputies had subjected Moore to substantial physical abuse **before** the incident in the bathroom. Roberts even participated in this abuse behavior.[6] In the early morning of November 28, 2018, the bathroom incident consisted of Moore's being thrown into the wall and metal toilet unit by Messer and Griffith. Roberts heard the commotion. He was shown on videotape as being in that bathroom -- although he denied seeing what occurred. Roberts was in charge and failed to report the incident or to seek medical treatment for Moore -- even after Deputy Beller had spoken to him about it. After the assault, Moore complained of back pain below his rib cage. He died the next morning while in custody. The cause of death was blunt force trauma to the torso, which caused posterior rib fractures and resultant bleeding. Under the evidence presented, it was not "clearly unreasonable" for the jury to find that Roberts caused Moore's death as defined by the statutes setting forth the elements of reckless homicide.

Next, Roberts submits that under KRS 501.060(3),[7] causation is not established in a reckless homicide case if the result is not a risk of which the

_____

[6] Roberts had been indicted by the grand jury for 16 counts of criminal abuse. At pages 6-7 of his Appellant's brief, Roberts outlines the incidents which resulted in his being convicted of **11** counts of criminal abuse in varying degrees. Of those incidents, **8** occurred *before* the incident in the bathroom.

[7] In relevant part, KRS 501.060(3) provides that: "[w]hen wantonly or recklessly causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of recklessness, of which he should be aware[.]"

defendant should be aware. In his brief, he asks: "[h]ow on earth would [he] have been aware that throwing someone into a toilet/sink could result in three fractured ribs which in turn could result in internal bleeding in the pleural cavity . . . ." On this theory, Roberts contends that there was an insufficient basis on which to convict him; *i.e.*, that there was no evidence that Moore's death was the result of Roberts's failing to perceive that his actions or inaction could result in Moore's death.

We agree with the Commonwealth that the result was wholly foreseeable. From the time that Moore entered BCDC, he was subjected to the deputies' sadistic physical abuse. Roberts was the supervisor in charge, and he did nothing to stop it. To the contrary, he allowed it to continue and even joined in. There was a substantial and unjustifiable risk that Moore would suffer significant injury that could lead to a fatality if the abuse continued. And it did.

Even a layperson would recognize that bouncing a person's head off the wall and throwing him into a metal toilet/sink could cause serious injuries requiring medical care. Moreover and shockingly, Moore is an experienced volunteer firefighter with 150 hours of training, including basic first aid and CPR. It is inconceivable that Roberts did not seek medical care for Moore -- not even after Deputy Beller spoke to him about it. Nor did Roberts seek medical treatment

for Moore after he suffered two seizures and had to be carried downstairs in clear disregard of "the book" kept in the booking area of the jail.

We agree with the Commonwealth that Moore's conduct was a gross deviation from the standard of care. It was not clearly unreasonable for the jury to find that Roberts failed to perceive a substantial and unjustifiable risk that his conduct would result in Moore's death.

We affirm the judgment of the Boyd Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Emily Holt Rhorer
Molly Mattingly
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Christina Romano
Assistant Attorney General
Frankfort, Kentucky